IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02853-CNS-NRN

ALEXANDRO DURAN,

      Plaintiff,

v.

WELLPATH, LLC;
THE BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF EL PASO, COLORADO;
SHERIFF JOSEPH ROYBAL, in his official capacity;
And GEORGE SANTINI, individually,

      Defendants.

---

## ORDER

---

Before the Court are two motions to dismiss: (1) the Wellpath Defendants' Motion to Dismiss Plaintiff's First Amended Complaint filed by Wellpath, LLC and Dr. George Santini, in his individual capacity; and (2) the El Paso County Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) filed by the Board of County Commissioners of El Paso County, Colorado and Sheriff Joseph Roybal, in his official capacity as El Paso County Sheriff. ECF Nos. 48, 25. For the following reasons, the Court denies both motions.

# I.  BACKGROUND[1]

## A. Mr. Duran's Injuries

Plaintiff Alexandro Duran experienced serious health issues while detained at the El Paso County Criminal Justice Center (CJC). Prior to his arrest, Plaintiff experienced a spinal cord injury in 2017 that resulted in paraplegia, causing him to permanently lose physical sensation and voluntary movement below his waist. ECF No. 19 (Am. Compl.), ¶ 9. Since 2017, Plaintiff has used a manual wheelchair with a medically prescribed foam and fluid-based seat cushion to prevent pressure sores. *Id.*

Pressure sores are dangerous and potentially life threatening for people with paraplegia because they can lead to infection. *Id.*, ¶¶ 18, 23. To avoid pressure sores, Plaintiff used a specialized seat cushion on his wheelchair and required a mattress of sufficient thickness. *Id.*, ¶¶ 15, 21.

Plaintiff was arrested in November 2021 and booked into the CJC. *Id.*, ¶ 10. There, he made prison staff aware of his disability and his need for accommodations. *Id.*, ¶ 11. For example, in the initial medical screening he requested that he be allowed to use a seat cushion in his wheelchair to prevent him from developing pressure sores. *Id.*, ¶ 15. Plaintiff alleges that this request, and several other requests, were denied. *Id.*, ¶¶ 15–16. Without the specialized seat cushion, Plaintiff could not sit in his wheelchair without risking developing pressure sores. *Id.*, ¶¶ 17–19. Rather than sitting in his wheelchair, Plaintiff would often lie on his bunk during the day. *Id.*, ¶ 19. However, the prison mattress

---

[1] The background facts are taken from the well-pleaded allegations in the First Amended Complaint, ECF No. 19. For purposes of this motion, the Court accepts as true, and views in the light most favorable to Plaintiff, all factual allegations contained in the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

was too thin, so Plaintiff still risked developing pressures sores. *Id.*, ¶ 20. He also could not reposition himself, which is critical in avoiding pressures sores. *Id.*, ¶ 19. Plaintiff repeatedly requested a thicker mattress as an accommodation but was denied. *Id.*, ¶ 21.

Plaintiff also requested a commode chair, which would allow him to access the toilet in his cell. *Id.*, ¶ 26. Plaintiff alleges that the Wellpath Defendants refused to provide it. *Id.* Without the commode chair, Plaintiff had to use adult diapers. *Id.*, ¶ 27. Plaintiff also requested a shower chair, which was denied. *Id.*, ¶ 29.

Without an appropriately thick mattress and seat cushion, Plaintiff developed severe pressures sores on his buttocks and hip. *Id.*, ¶ 22. Those sores then became infected. *Id.*, ¶ 23. He was first seen by nurse Jesse Gerber for his sores on December 18, 2021, at which time she observed that he had a "Stage 4" pressure sore on his buttocks. *Id.*, ¶¶ 33–34. Nurse Gerber also observed black necrotic tissue, pus filling the wound, and signs of infection. *Id.*, ¶ 35. Nurse Gerber noted that the wound was five centimeters in diameter and showed signs of tunnelling into Plaintiff's flesh and undermining into the tissue beneath Plaintiff's skin beyond the wound's diameter. *Id.*, ¶ 35. Nurse Gerber determined that Plaintiff needed daily wound care, including debridement. *Id.*, ¶ 38.

Stage 4 pressure sores are the most serious type of pressure sores. *Id.*, ¶ 36. Tunnelling and undermining pose a heightened risk of severe infection that can reach the spine. *Id.*, ¶ 37.

On December 20, 2021, Defendant Dr. George Santini saw Mr. Duran. *Id.*, ¶ 39. His notes confirm that Mr. Duran had a Stage 4 pressure sore, which had grown to "6 x 8 centimeters deep." *Id.*, ¶ 40. He also observed feces near the wound site. *Id.*

Plaintiff alleges that trained medical professionals know that Stage 4 pressure sores are potentially life threatening, and require aggressive treatment, regular cleaning, and debridement of necrotic tissue. *Id.*, ¶ 41. Plaintiff alleges that these treatments are medically necessary to avoid infection and to promote healing. *Id.* Wellpath staff did not provide this care; they only intermittently changed Mr. Duran's wound dressings, and they did not perform debridement. *Id.*, ¶ 43. Sometimes Mr. Duran went a week without receiving a dressing change. *Id.* This lack of care continued for six weeks after Dr. Santini's visit; over that period, Mr. Duran's wound worsened without daily dressing changes and debridement. *Id.*, ¶¶ 43–44. Plaintiff alleges that Dr. Santini followed the progression of Plaintiff's wound between December 20, 2021, and February 14, 2022. *Id.*, ¶ 45. Plaintiff also alleges that Dr. Santini knew, by January 6, 2022, that Plaintiff's wound was not likely to heal on its own and that he needed a wound vac, which is a medical device used to promote wound healing and cleanliness. *Id.*, ¶¶ 46–47. Plaintiff did not receive one. *Id.*, ¶ 48. Plaintiff also alleges that he repeatedly requested to be transferred to a hospital, but his requests were ignored or denied. *Id.*, ¶ 31.

In the first week of February 2022, jail officials finally sent Mr. Duran to a UC Hospital for treatment. *Id.*, ¶ 49. Doctors at the UC hospital noted that Mr. Duran's infection had spread to his spine and diagnosed him with osteomyelitis. *Id.* At that point,

hospital doctors noted that it was too late for a wound vac to help Mr. Duran, and that he required special surgery because his wound was so advanced. *Id.*

Mr. Duran returned to the CJC from the hospital around February 8, 2022. *Id.*, ¶ 50. He was medically furloughed from CJC around February 14, 2022, allegedly because the Wellpath Defendants and Dr. Santini did not provide the treatment that Mr. Duran needed for his pressure sores. *Id.*, ¶ 50. Since then, he has been in and out of hospitals and nursing homes for treatment of his pressure sores and the related infections. *Id.*, ¶ 32.

**B.      Wellpath's History at the El Paso County Facility**

Wellpath's predecessor entity was CCS; the El Paso County Defendants had contracted with CCS to provide medical care at CJC for years prior, up until 2017. *Id.*, ¶ 55. In 2017, the El Paso County Defendants fired CCS, allegedly because it provided substandard medical care that exposed detainees to risk of serious harm. *Id.*, ¶ 56. Plaintiff alleges multiple problems with CCS's system at the CJC, including seriously backlogged medical requests, delaying referrals to outside care, and detainees' serious medical needs going unmet. *Id.*, ¶ 57.

After the El Paso County Defendants fired CCS, they hired Armor (another private medical contractor) to provide medical services at the CJC. *Id.*, ¶ 58. Armor provided services there until 2019, when it allegedly discontinued work because the system that it inherited from CCS was "too dysfunctional." *Id.*, ¶¶ 58–59. The El Paso County Defendants then re-hired CCS, now renamed Wellpath, to again provide medical care

services for CJC detainees. *Id.*, ¶ 60. Plaintiff alleges that the El Paso County Defendants knew that Wellpath's problems would continue under the 2019 contract. *Id.*

Plaintiff further alleges that, as expected, the medical program at the CJC under the 2019 contract was inadequate, particularly relating to staffing levels and failing to obtain outside medical treatment. Plaintiff cites examples of detainees with serious medical needs going unmet at the CJC: in February 2021, a detainee jumped head-first from a second-floor balcony and suffered significant brain injuries after Wellpath staff failed to adequately respond to his serious mental health needs. *Id.*, ¶ 63. In September 2021, William Johnson died from a seizure after Wellpath staff failed to provide him his prescription medications. *Id.*, ¶ 65. On February 2, 2022, Princeton Jackson, who is paraplegic, suffered severe medical complications, including dehydration and infection, after not receiving necessary catheters and enemas. *Id.*, ¶ 67. On February 16, 2022, Sean Williams died in the medical unit after Wellpath staff allegedly ignored him when he was experiencing a life-threatening condition. *Id.*, ¶ 66. In April 2022, Cristo Cannett died in his cell from untreated medical conditions. *Id.*, ¶ 67. Plaintiff also alleges that, between 2020 and 2022, there were at least 19 deaths at the CJC, many of which were preventable. *Id.*, ¶ 70.

## II.  STANDARD OF REVIEW

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g.*, *Mayfield v.*

*Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation omitted). In assessing a claim's plausibility, "legal conclusions" contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

### III.  DISCUSSION

Having reviewed the First Amended Complaint, the motions to dismiss, the related briefing, and relevant legal authority, the Court denies both the Wellpath Defendants' motion to dismiss and the El Paso County Defendants' motion to dismiss. The Court addresses the motions in turn.

### A.  The Wellpath Defendants' Motion to Dismiss

The Wellpath Defendants move to dismiss Plaintiff's (1) deliberate indifference to serious medical needs claims against Dr. George Santini, (2) *Monell* claim against Wellpath, LLC, and (3) medical negligence claim against Wellpath and Dr. Santini. ECF

No. 48. As discussed below, the Court finds that Plaintiff pleaded sufficient facts to support his claims against the Wellpath Defendants.

1.  *Plaintiff's Fourteenth Amendment Deliberate Indifference Claim Against Dr. George Santini*

Because Mr. Duran was a pretrial detainee while he was at the CJC, his constitutional claims arise under the Fourteenth Amendment.[2] The parties do not dispute this classification.

Under the Fourteenth Amendment, pretrial detainees have a constitutional right to adequate medical care. *See, e.g., Est. of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994). A claim for inadequate medical care under the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983, is analyzed under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303 (10th Cir. 1985). Under this test, the detainee must show that a medical professional acted with deliberate indifference to the detainee's serious medical needs. *Id.*; *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation omitted). The test for deliberate indifference involves both "an objective and subjective component." *Sealock*, 218 F.3d at 1209 (citation omitted).

To satisfy the objective component, a plaintiff must allege facts demonstrating that their medical need was "sufficiently serious." *See Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quotation omitted). A medical need is "sufficiently serious" if it has

---

[2] Regardless of whether Mr. Duran was a pretrial detainee or a post-conviction inmate, the analysis for deliberate indifference would be identical. *See Est. of Booker v. Gomez*, 745 F.3d 405, 430 n.30 (10th Cir. 2014) ("[A]lthough pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (internal citations and quotation marks omitted)).

been diagnosed by a physician as mandating treatment or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. A delay in medical care satisfies the objective component if a plaintiff alleges facts showing that the delay "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citation omitted). A substantial risk of harm is sufficiently serious if it is "sure or very likely to cause serious illness and needless suffering" or gives rise to "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993).

To satisfy the subjective component, a plaintiff must allege facts demonstrating the prison official's "culpable state of mind," meaning facts that the official (1) knows of and (2) disregards an excessive risk to inmate health or safety. *See id.*; *Sealock*, 218 F.3d at 1209.

To establish knowledge, a prison official (1) must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) must have drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 387 (1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious." *Lucas v. Turn Key Health Clinics,* LLC, 58 F.4th 1127, 1137 (10th Cir. 2023) (citing *Farmer*, 511 U.S. at 842). A plaintiff may adequately allege that a medical official knew that a detainee faced a substantial risk of harm from the fact that the risk was obvious; if a risk is so obvious that a reasonable person would realize it, a court may infer that the defendant did, in fact, realize it. *Est. of*

*Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1263 (10th Cir. 2022) (quotation omitted).

"A medical condition is not required to be obvious to a layman to state a claim," although whether a condition would be obvious to a layman is a factor indicating obviousness. *Lucas*, 58 F.4th at 1139. In a missed diagnosis or delayed referral context, such circumstantial evidence of obviousness could include "(1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical emergency." *Id.* Additionally, a medical professional's "heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk," especially when the injuries are "impossible for a layman to surmise." *Id.*

An official disregards a risk when they fail to take reasonable measures to abate that risk. *Id.* at 1137. A plaintiff can sufficiently plead disregard of a risk in two ways: alleging a failure to properly treat a serious medical condition (the failure to properly treat theory) or alleging a prevention in treatment or denial of access to a medical professional capable of evaluating the need for treatment (the gatekeeper theory). *Id.* at 1138. Under the failure to properly treat theory, the Tenth Circuit looks to whether "there was a functional denial of care at the time the need for treatment obviously arose." *Id.* It is not necessary to prove that the inmate received no care; a provider can be held liable for "woefully inadequate" treatment, like prescribing over the counter medicines for serious symptoms indicating substantial risk to health. *See id.; Oxendine v. Kaplan*, 241 F.3d

1272, 1279 (10th Cir. 2001) (finding liability where the medical provider only prescribed Tylenol for a gangrenous hand).

The gatekeeper theory applies when a medical professional knows that their role in a medical emergency is solely to refer the patient to a more qualified medical professional. *Id.* A prison medical professional who serves "as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751; *Est. of Jensen v. Clyde*, 989 F.3d 848, 860 (10th Cir. 2021). A gatekeeper fails in their duty if they "den[y] access to someone capable of evaluating the inmate's need for treatment." *Lucas*, 58 F.4th at 1137. "Even a brief delay in treatment can be unconstitutional." *Id.*

### a. Objective Component

The Wellpath Defendants do not appear to dispute that the objective component is satisfied. ECF No. 48 at 6. Regardless, the Court finds that it is. Plaintiff had Stage 4 pressure sores. Stage 4 is the most severe stage of pressure sores, and they are potentially life threatening because of their risk of serious infection. The objective component is satisfied if the symptoms were severe enough to prompt a layperson to seek immediate medical attention. *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quotation omitted); *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022). Here, Plaintiff's pressure sores were sufficiently severe: they were large, measuring five centimeters in diameter at their smallest, showing signs of infection, and tunnelling into his flesh. ECF No. 19, ¶¶ 34–36, 40. Tunnelling and undermining sores pose a heightened

risk of infection, because they can reach the spine. *Id.* at ¶ 37. Because Stage 4 pressure sores are severe enough to prompt a layperson to seek immediate medical attention, the objective component is satisfied.

### b. Subjective Component

The Wellpath Defendants first dispute the knowledge component of subjective indifference, arguing that Plaintiff did not allege that Dr. Santini knew that Mr. Duran was experiencing a serious medical need. The Court disagrees.

A medical professional's subjective awareness can be inferred from circumstantial evidence, including whether the risk was obvious to a reasonable person in the provider's position. *Lucas*, 58 F.4th at 1137. Plaintiff alleges that "[t]rained medical professionals know that Stage 4 pressure sores are potentially life threatening . . . and that it is of the utmost importance to treat them aggressively," "keep them clean," and keep them "debrided of necrotic tissue." ECF No. 19, ¶ 41. Additionally, Plaintiff alleges that "not providing Plaintiff with daily wound care and debridement would expose Plaintiff to a risk of serious harm." *Id.*, ¶ 42. Plaintiff also alleges that medical staff, supervised by Dr. Santini, determined that Plaintiff needed daily wound care and debridement. *Id.*, ¶ 38. Plaintiff also alleges that Dr. Santini "saw Plaintiff" and "confirmed that Plaintiff had a Stage 4 pressure sore," which was "6 x 8 centimeters deep" with "feces near the wound site." *Id.*, ¶¶ 39–40. Plaintiff also alleges that "[o]n information and belief, Dr. Santini was subjectively aware as of December 20, 2021 that daily wound care and debridement was medically necessary for Plaintiff, and that trained medical professionals know that Stage

4 pressure sores are potentially life threatening and that it is of the utmost importance to treat them aggressively and keep them clean. *Id.*, ¶¶ 41–42.

The Wellpath Defendants argue that Plaintiff failed to "connect the dots" between these two facts—that Dr. Santini, as a trained medical professional, knew that Plaintiff's Stage 4 pressure sores constituted a serious medical need—because he did not explain how Dr. Santini would know this. The Court disagrees. Plaintiff alleges that Dr. Santini knew that Mr. Duran experienced Stage 4 pressure sores, that trained medical professionals know that Stage 4 pressure sores are potentially life threatening, and that Stage 4 pressure sores require aggressive treatment, including daily wound care and debridement. Plaintiff also alleges that Dr. Santini knew that Mr. Duran required daily wound care and debridement. Awareness of the medical necessity of such care indicates that Dr. Santini was aware of the danger that would be posed by not providing such care.

Additionally, because of the medical training that doctors have, a reasonable person with training would know that Stage 4 pressure sores were dangerous enough to warrant aggressive care.[3] These wounds would be obviously alarming to a reasonable layperson, let alone a reasonable doctor, so Dr. Santini should have made the inference that these pressure sores put Mr. Duran at a substantial risk of harm. Although Plaintiff did not state precisely that Dr. Santini knew that Stage 4 pressure sores were dangerous, Plaintiff pleaded enough facts to support the inference of knowledge, which is enough to satisfy the liberal pleading standard. The Court finds the pleadings sufficient. These

---

[3] The Tenth Circuit has applied a reasonable person standard. See *Lucas*, 58 F.4th at 1139; *Quintana v. Santa Fe Cnty. Board of Comm'rs*, 973 F.3d 1022, 1041 n.3 (10th Cir. 2020) (concurring) ("[T]he proper subjective inquiry is whether . . . a substantial risk . . . would have been obvious to a reasonable person in the defendant's shoes.").

allegations are sufficient to establish that Dr. Santini was subjectively aware that Mr. Duran faced a substantial risk of serious harm.

The Wellpath Defendants also dispute that Dr. Santini disregarded the risk. The Wellpath Defendants argue that Dr. Santini did not consciously disregard Plaintiff's pressure sores because he "followed the progression of Plaintiff's wound," and Plaintiff received some wound care during that time. ECF No. 19, ¶¶ 43, 45; ECF No. 48 at 7. However, simply being aware that Plaintiff received some wound care is not necessarily a reasonable abatement of the risk that Plaintiff faced from his pressure sores. The standard for whether the defendant disregarded risk, under a failure to treat theory, is whether a medical provider failed to *properly* treat the patient. Plaintiff alleges that medical staff, under Dr. Santini's supervision, only intermittently changed Plaintiff's wound dressing, sometimes letting a full week pass without a dressing change, and that they did not perform any debridement or provide him with a wound vac. ECF No. 19, ¶¶ 8, 43, 46. Dr. Santini oversaw the provision of medical care at the CJC, supervised the people who provided wound care, and knew of Mr. Duran's treatment. ECF 19, ¶ 8. Providing a minimum amount of care is not enough to avoid liability. Because Plaintiff alleges that daily wound care, a wound vac, and debridement were necessary treatments for Stage 4 pressure sores, and that Dr. Santini knew these treatments were necessary, failing to provide them amounts to a functional denial of care.

The Wellpath Defendants also assert that Dr. Santini's decision to not order a wound vac and debridement was nothing more than a difference of opinion between the inmate and medical staff. *Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993); *Sherman*

*v. Klenke*, 653 F. App'x 580, 586 (10th Cir. 2016). The Court disagrees. Plaintiff alleges that a wound vac and debridement were necessary care, and that a delay in providing that care would place Mr. Duran at a substantial risk of harm due to the nature of his wounds. ECF No. 19, ¶¶ 43, 46. This Court has rejected similar arguments when the course of treatment that the medical professional failed to perform was alleged to be medically necessary. *Rogacki v. Jefferson Cnty.*, No. 1:21-CV-02281-CNS-KLM, 2022 WL 16551336, at *4 (D. Colo. Oct. 31, 2022); *Est. of Angelo v. Board of Cnty. Comm'rs. of Jefferson Cnty.*, No. 1:23-cv-01607-CNS-STV, 2024 WL 2274080 (D. Colo. May 20, 2024).

As alleged, Dr. Santini knew of and disregarded the substantial risk of serious harm to Mr. Duran and failed to treat him properly. This satisfies the subjective component of the deliberate indifference test. Plaintiff pleaded sufficient facts to support a deliberate indifference claim against Dr. Santini. For that reason, the Court denies the motion to dismiss related to him.

### 2. Plaintiff's Fourteenth Amendment *Monell* Claim Against *Wellpath*

To establish an entity's liability, the plaintiff must first plausibly allege an underlying constitutional violation: that the entity's employee or employees violated the plaintiff's constitutional rights. *See Est. of Beauford*, 35 F.4th at 1275. The plaintiff must then show that the entity is liable for the employee's violation of the plaintiff's constitutional rights by showing (1) the existence of a policy or custom; (2) a "direct causal link between the policy or custom and the injury alleged," meaning that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional rights; and (3) that the private

entity enacted or maintained the policy with "deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997).

A plaintiff satisfies the "official policy or custom" element by plausibly alleging the existence of:

> (1) A formal regulation or policy statement;
> (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
> (3) the decisions of employees with final policymaking authority;
> (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or
> (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and formatting omitted). The "official policy or custom" requirement is intended to distinguish "acts of the municipality from acts of employees of the municipality," making clear that municipal liability is limited to actions "for which the municipality is actually responsible." *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 932 (10th Cir. 2013).

The "deliberate indifference" element may be satisfied where the entity has actual or constructive knowledge that its acts or failure to act is "substantially certain to result in a constitutional violation," and the entity "consciously or deliberately" chooses to disregard the risk of harm. *Schneider*, 717 F.3d at 771 (quotation omitted). Notice can be

established either by a "pattern of tortious conduct" or if a violation of rights is a "highly predictable" or "plainly obvious" consequence of the entity's action or inaction. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

Plaintiff brings a Fourteenth Amendment claim against Wellpath based on its allegedly unconstitutional policies and practices.[4] The Wellpath Defendants argue that Plaintiff only makes conclusory allegations, and so the *Monell* theory fails. ECF No. 48 at 6. Plaintiff alleges that Wellpath had an informal custom of maintaining an inadequate medical program, specifically through inadequate staffing levels and failing to refer to off-site treatment, that caused Mr. Duran's injury. ECF No. 19 ¶ 61. As established above, Plaintiff has adequately pleaded the first element of *Monell* liability: that the entity's employee, Dr. Santini, violated Mr. Duran's constitutional rights.

a. *Informal Custom Amounting to Widespread Practice*

Plaintiff alleges *Monell* liability based on Wellpath's informal custom, amounting to a widespread practice, of maintaining an inadequate medical program that posed a risk of harm to detainees. Specifically, Plaintiff alleges that Wellpath maintained inadequate staffing levels and backlogged medical requests, and failed to refer detainees for outside treatment when their medical needs could not be met onsite. ECF No. 19, ¶¶ 55–61. These practices were widespread and well known, according to Plaintiff, to the point that the El Paso County Defendants fired Wellpath and hired a different contractor because of these issues. *Id.*, ¶¶ 56–58. After the other contractor left, and because the problems

---

[4] The Tenth Circuit has extended *Monell* liability to private entities. *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1275 (10th Cir. 2022).

were too entrenched, the El Paso County Defendants rehired Wellpath. *Id.*, ¶ 61. The issues persisted. *Id.* These allegations sufficiently plead the existence of an informal custom amounting to a widespread practice of providing inadequate medical care. The Tenth Circuit has held that a custom of deficient medical care existed when inspectors identified recurring issues with the medical care; similarly here, the fact that the El Paso County Defendants recognized this deficiency, and acted on it by firing Wellpath, sufficiently indicates the existence of a widespread practice. *Burke v. Regalado*, 935 F.3d 960, 999 (10th Cir. 2019).

To further illustrate the existence of this practice, Plaintiff lists six instances of inadequate health care at Wellpath facilities, including three at the CJC, caused by Wellpath's custom of providing inadequate care. ECF No. 19, ¶¶ 63–68. Plaintiff also points to 19 deaths that occurred at the CJC while detainees were under Wellpath's care, many of which were preventable, between 2020 and 2022. *Id.*, ¶ 70. As the Wellpath Defendants point out, Plaintiff must show "either a pattern of multiple similar instances of misconduct——no set number is required . . . or use other evidence, such as [the Wellpath official's] statements attesting to the policy's existence." *Est. of Kowalski v. Shrader*, 2022 WL 19422, at *19 (D. Colo. Jan. 3, 2022). The Wellpath Defendants argue that these allegations are insufficient because they are not similar enough to Mr. Duran's experience, because none of the other detainees experienced Stage 4 pressure sores and none required an off-site transfer to care for their Stage 4 pressure sores. Although it is true that Plaintiff does not point to a previous instance of pressure sores, Plaintiff alleges that the custom in question is broader than failing to treat pressure sores. Rather,

Plaintiff makes a systemic allegation that applies to all of these instances: that the health care provision system is deficient.[5] Plaintiff adequately articulated a custom of delaying transfers to off-site medical services, maintaining backlogged medical requests, and understaffing, amounting to a custom of running an inadequate medical program.

The Wellpath Defendants also dispute the causation element. The Court finds, however, that as alleged, a reasonable jury could find that these deficiencies resulted in Mr. Duran's injuries. The challenged custom plausibly caused delay in the treatment of Mr. Duran's pressure sores, including delaying transferring him to a hospital for treatment until he became septic, and failing to provide necessary care, which caused his condition to worsen. *Id.*, ¶ 31. Dr. Santini's treatment of Mr. Duran was "consistent with the chronic deficiencies" in medical care that amounted to a widespread practice. *Burke*, 935 F.3d at 999; *Hollingsworth*, 110 F.3d at 744. Plaintiff sufficiently pleaded causation because a reasonable jury could find that the systemic deficiencies resulted in Mr. Duran not receiving daily wound care and debridement and not getting referred to a hospital soon enough, which caused Mr. Duran's sores to worsen.

Plaintiff also adequately pleaded the deliberate indifference element; as alleged, a reasonable jury could conclude that Wellpath was deliberately indifferent to the risk that

---

[5] The Wellpath Defendants also argue that these allegations are insufficient in part because they are not supported by officials' statements attesting to the custom's existence, citing to *Est. of Kowalski v. Shrader*, 2022 WL 19422, at *19 (D. Colo. Jan. 3, 2022). However, the Wellpath Defendants misread that quotation: the point is that Plaintiff must show "*either* a pattern of multiple similar instances of misconduct . . . or use *other evidence, such as* [an official's] statements attesting to the policy's existence. *Id.* (emphasis added). ECF No. 66 at 6. An official's statements are just one example of "other evidence," not the only acceptable form of other evidence. "Such as" indicates that the referred to term is an example, not an exhaustive definition. Here, Plaintiff showed both multiple similar instances of misconduct, by pointing to 6 similar negative health outcomes caused by inadequate medical care, along with the "other evidence" of El Paso County's decision to terminate its contract with Wellpath because of these deficiencies.

deficient medical care would result in a constitutional violation like the one Mr. Duran suffered. *Burke*, 935 F.3d at 1000. Plaintiff alleges that Wellpath was on notice that its widespread practice of inadequately providing medical care, specifically through understaffing and significant backlogs, was likely to result in a constitutional injury. *See, e.g.,* ECF No. 19, ¶¶ 56–58. Plaintiff established that Wellpath was on notice because Wellpath was allegedly fired for providing "substandard medical care that exposed detainees to risk of serious harm," and that the health provision system was so dysfunctional that the subsequent contractor stopped working there. *Id*. Plaintiff then alleges that, when Wellpath returned as the medical contractor, the same problems persisted. *Id.*, ¶ 61. Plaintiff sufficiently pleaded all three elements of the unconstitutional informal custom theory of *Monell* liability.

### 3. Plaintiff's State Law Claim for Medical Negligence Against the Wellpath Defendants

Finally, the Wellpath Defendants move to dismiss Plaintiff's state law medical negligence claim against Wellpath and Dr. Santini. First, they argue that Plaintiff did not file a Certificate of Review. ECF No. 48 at 11. However, at that time, the deadline for filing had not passed. Plaintiff has since timely filed a Certificate of Review, so this argument is moot. ECF No. 52.

To prevail on a medical negligence claim, Plaintiff must allege that "(1) the named [D]efendants owed him a legal duty to conform to the appropriate standard of care; (2) the individual [D]efendants breached that duty; (3) Plaintiff suffered injury; and (4) there is a causal relationship between the breach and the injury." *Fresquez v. Baldwin*, 2010 WL 5934891, at *22 (D. Colo. Dec. 15, 2010) (citation omitted).

Plaintiff alleges that Dr. Santini had a "duty to Plaintiff to exercise the degree of skill, care, caution, diligence, and foresight exercised by and expected of medical professionals in similar positions." ECF No. 19, ¶ 41. Plaintiff also alleges that "Trained medical professionals know that Stage 4 pressure sores are potentially life threatening [to individuals] like Plaintiff and that it is of the utmost importance to treat them aggressively and keep them clean . . . [and] debrided of necrotic tissue." *Id.*

As to breach, Plaintiff alleges that the Dr. Santini breached his duty by "failing to provide adequate treatment for Plaintiff's pressure sores," and, as a result, "Plaintiff suffered damages, including but not limited to significant physical injury, sickness, suffering, and emotional distress." ECF No. 19, ¶¶ 91–93. Defendants argue that Plaintiff only recites the threadbare elements of medical negligence and fails to describe how Dr. Santini breached his duty to treat Plaintiff's pressure sores. The Court is not convinced, and finds that Plaintiff adequately pleaded breach: "[d]espite the obvious medical necessity of daily wound care and debridement, Defendants Wellpath and Santini did not provide those services to Plaintiff. Over the next six weeks, medical staff changed Plaintiff's wound dressings, but only intermittently, and there was no debridement. Sometimes a full week would pass without Plaintiff receiving a dressing change." ECF No. 19, ¶ 43. For medical negligence claims, the standard of care is for a medical professional to exercise the skill and care expected of a medial professional with their experience. Plaintiff sufficiently alleges that a doctor with Dr. Santini's experience would be expected to provide daily wound care and debridement for wounds like Mr. Duran's. He breached this duty by failing to provide this type of care. The failure to provide daily

wound care and debridement caused Mr. Duran's pressure sores to worsen, satisfying the injury and causation elements. Plaintiff sufficiently pleaded medical negligence.

Because Plaintiff sufficiently pleaded the tort claim against Dr. Santini, the vicarious liability claim against Wellpath has an underlying claim upon which to attach, so it may continue as well. The Court denies the Wellpath Defendants' motion to dismiss.

### B. El Paso County Defendants' Motion to Dismiss

The El Paso County Defendants move to dismiss (1) all claims against the Board as a party, (2) the ADA and Rehabilitation Act claims against the El Paso County Defendants, (3) the municipal liability claims based on *Monell* and the non-delegable duty doctrine against the county, and (4) any claims for emotional distress damages and punitive damages. ECF No. 25. The Court denies this motion.

### 1.  *The Board of County Commissioners of El Paso County*

The El Paso County Defendants first move to dismiss all claims against the Board of County Commissioners because it is not the proper entity. The Court agrees that the Sheriff is typically the proper entity to sue for harms that occurred at a county jail. *See* Colo. Rev. Stat. § 30-10-511. However, at this stage in the proceedings, Plaintiff has alleged enough facts that the Board was plausibly involved in setting jail policy to make dismissal of the Board unwarranted.

The proper party depends on whether the Board or the Sheriff was involved in setting the policies at issue. The Board and the Sheriff are separately suable, and either or both may be the proper party. "Under Colorado law, a board of county commissioners and a sheriff in the same county are distinct public entities . . . a board of county

commissioners has no control over the sheriff's employees and is not liable for negligent acts of the sheriff's employees." *Est. of Blodgett v. Correct Care Sols., LLC*, No. 17-cv-2690-WJM-NRN, 2018 WL 6528109, at *8 (D. Colo. Dec. 12, 2018); *see also Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005). Plaintiff alleges that the Board is a proper party because the Board decided to hire Wellpath to provide medical services at the CJC. ECF No. 49 at 3. Defendants argue that the Board is not a proper party because it has no involvement with CJC policy. ECF No. 25. The Sheriff is undoubtedly a proper party, because the Sheriff is the custodian of the CJC and is responsible for the individuals incarcerated in the jail. Colo. Rev. Stat. § 30-10-511; ECF No. 25.

The Board may also be a proper party, so the Court declines to dismiss the Board at this stage.[6] A board may also be a proper party when a plaintiff alleges that it "was itself involved in setting or implementing a detention facility's allegedly unconstitutional policies." *Rogacki v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colorado*, No. 1:21-cv-02281-CNS-KLM, 2023 WL 34755 (D. Colo. Jan. 4, 2023); *Est. of Lillis v. Correct Care Sols., LLC*, No. 16-cv-03038-KLM, 2018 WL 10954152, at *5 (D. Colo. Oct. 22, 2018) (recognizing that the board of county commissioners, not the sheriff, was the responsible party for the wrongs alleged and so naming the board as a party to the suit was "not futile."). Here, Plaintiff sufficiently alleges that the Board was involved in establishing the jail's policies on providing medical care. ECF No. 19; *see Blodgett*, 2018 WL 6528109, at

---

[6] This Court has previously declined to dismiss the board at this stage in the proceedings. *Id.* ("it is appropriate for Mr. Rogacki to name both the Board of County Commissioners and relevant sheriff in this action. If discovery later reveals that only the sheriff was involved in the polices related to Wellpath's medical care at the Jail, the Court shall revisit the question of which Defendants should be properly named or dismissed").

*8 (granting the motion to dismiss where the plaintiff did not allege "any policy of the board" that would support a claim against it). The Board's decision to rehire Wellpath as CJC's medical provider in 2019, knowing that Wellpath would not provide a constitutionally adequate medical program based on its prior experience with Wellpath, plausibly amounts to involvement in setting the jail's medical provision policy. ECF No. 19, ¶¶ 52–60; ECF No. 49 at 3. The Court agrees with Plaintiff that he has alleged more than that the Board simply entered into a contract; given its background with Wellpath and its knowledge of how Wellpath operates, Plaintiff has plausibly alleged the Board's involvement with setting jail policy. At this stage in the proceedings, the Court is unwilling to dismiss the Board.

### 2. Plaintiff's ADA and Rehabilitation Act Claims

#### i.   Discrimination by Reason of Disability

Claims under the ADA and the Rehabilitation Act are evaluated identically. *Crane v. Utah Dept. of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021). Title II of the ADA, which applies to detention facilities, states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, a plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability, meaning the disability is a but-for cause. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193

24

(10th Cir. 2007); *Crane*, 15 F.4th at 1313. Based on the second element, courts have recognized two types of claims: exclusion from or denial of benefits, and discrimination. Within discrimination, courts recognize three theories of claims: (1) intentional discrimination and disparate treatment, (2) disparate impact, and (3) failure to make a reasonable accommodation. *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). Plaintiff asserts the third claim: failure to make a reasonable accommodation. ECF No. 49 at 6.

Plaintiff alleges two bases for discrimination: failing to reasonably accommodate his need for a wheelchair seat cushion, a thicker mattress, and a shower and toilet chair, and failing to provide him critical healthcare services for pressure sores. ECF No. 19, ¶ 7. The Court agrees with the El Paso County Defendants that the ADA does not typically cover allegedly negligent medical decisions. *Rashad v. Doughty*, 4 Fed. App'x. 558, 560 (10th Cir. 2001) ("[T]he failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation."). So Plaintiff's ADA claim can only be based on the failure to accommodate theory.

The El Paso County Defendants dispute the causation element. Plaintiff alleges that he made requests for a wheelchair seat cushion, a thicker mattress, and a bathroom chair that were all denied. The El Paso County Defendants point out that the complaint does not specify how he made these requests, when he made them, or to whom, or that other inmates without his disability were treated differently. ECF No. 25 at 5. However, at this stage in the proceedings, Plaintiff has alleged enough to establish a causal link

between his exclusion and his disability being the but-for cause of that exclusion. Plaintiff adequately alleges that he sought and was denied reasonable accommodations. He alleges that he could not access the toilet and shower facilities because Defendants denied him accommodations, including a toilet and shower chair. ECF No. 19, ¶¶ 24–30. He also alleges that he was unable to use his wheelchair, and so unable to access the public spaces and activities without being mobile, because he was not given an adequate seat cushion. *Id.*, ¶¶ 16–19. There is enough causal connection here: but for his disability, Mr. Duran would have been able to access the public spaces and the programs and activities that occurred therein; and but for the denial of his accommodation, he would have been able to access the same. The Tenth Circuit has agreed: "Any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability.'" *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017).

   *ii. Direct* Monell *Liability*

  The Court analyzes the El Paso County Defendants' municipal liability under the same *Monell* standard discussed above. A plaintiff may establish "direct" *Monell* liability where a municipal employee committed a constitutional violation, a municipal policy or custom was the "moving force" behind the plaintiff's constitutional injury, and the custom was maintained with "deliberate indifference" to the plaintiff's constitutional injury. *See Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931 (10th Cir. 2013) (quoting *Schneider*, 717 F.3d at 769).

  Here, Plaintiff alleges that the El Paso County Defendants had one informal custom amounting to a widespread practice that violated Mr. Duran's rights: the decision

to contract with Wellpath, despite knowing Wellpath's practice of constitutional violations. ECF No. 49 at 12. Plaintiff also alleges that the Board's decision to contract with Wellpath is a policy because it is a ratification of Wellpath's dangerously inadequate system.

The first element of an informal custom, an underlying constitutional violation committed by the entity's employees, has been established above.

Plaintiff pleaded enough to establish deliberate indifference based on El Paso County's decision to contract with Wellpath. The contract itself does not constitute a county policy. *See Rogacki,* 2022 WL 16551336, at *11. However, the decision to contract with Wellpath may be considered an informal custom, for the reasons discussed above. It may also be considered a custom under a ratification theory, based on the Board's awareness of Wellpath's unconstitutional actions. Plaintiff has sufficiently pleaded that the decision to contract with Wellpath caused Mr. Duran's injury, because but for the contract Wellpath would not have been in a position to harm him. Additionally, Plaintiff sufficiently established the deliberate indifference element, meaning he adequately pleaded that El Paso County knew enough about Wellpath's unconstitutional practices to constitute deliberate indifference in its decision to contract with Wellpath.

Plaintiff alleges that the El Paso County Defendants knew about Wellpath's dysfunctional health care system, and that the dysfunctional system was the reason the county terminated the contract in 2017. ECF No. 19, ¶¶ 56–61; ECF No. 25 at 12. The six instances of harm to CJC detainees are illustrations of the dysfunctional system, but are not themselves what put the county on notice of the system. ECF No. 19, ¶¶ 56–61; ECF No. 25 at 12. The decision in 2019 to renew the contract was made knowing that the

county had previously terminated the contract because of its deficient system and that the new contractor had quit because of the deficient system. ECF No. 19, ¶¶ 56–61; ECF No. 25 at 12. The decision to contract with Wellpath, with prior knowledge of the deficiencies of that system, plausibly constitutes deliberate indifference. *See also Naranjo v. Wellpath, LLC*, No. 23-cv-01211-DDD-MDB, at *5 (D. Colo. Mar. 27, 2024) (unpublished). Plaintiff plausibly stated a direct *Monell* liability claim against the El Paso County Defendants.

*iii. Nondelegable Duty Doctrine and Indirect Municipal Liability*

Plaintiff also alleges that the El Paso County Defendants are liable under the nondelegable duty doctrine, claiming that they "had a non-delegable duty to provide constitutionally adequate care for detainees in their custody." ECF No. 19, ¶ 53. The El Paso County Defendants argued that Wellpath's alleged custom was not unconstitutional, and so El Paso County would not be liable under the nondelegable duty doctrine. ECF No. 25 at 9–10. Plaintiff counters that Wellpath's custom was unconstitutional, for the reasons described above. The Court agrees with Plaintiff.

Under the non-delegable duty doctrine, a public entity may be indirectly liable under § 1983 for a third party's policies when it contracts out its final policymaking authority to a third party. *See, e.g.*, *Jarvis v. McLauglin*, No. 1:20-cv-02028-CNS-GPG, 2022 WL 4388399, at *3 (D. Colo. Sept. 22, 2022). "[T]he question is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by [the healthcare contractor]'s policy, but whether [the contractor] had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable

because [the contractor] stepped into the County's shoes with the County's permission." *Est. of Walter v. Corr. Healthcare Cos.*, 323 F. Supp. 3d 1199, 1215-16 (D. Colo. 2018). To establish liability against a public entity under the non-delegable duty doctrine, a plaintiff must present evidence that the third party satisfies the three *Monell* requirements: that the third party promulgated a policy or custom, that the policy or custom was the "moving force" behind the violation of the plaintiff's constitutional right, and that the third party enacted or maintained the policy or custom with "deliberate indifference to an almost inevitable constitutional injury." *See Est. of Lovern by & through Dailey v. Correct Care Sols., LLC*, No. 18-CV-02573-KLM, 2019 WL 2903589, at *7 (D. Colo. July 3, 2019); *Schneider*, 717 F.3d at 769. If a plaintiff satisfies all three requirements, the public entity may be liable because the third party's policies are considered to have become the public entity's policies. *See Est. of Walter*, 323 F. Supp. at 1216.

As the *Lovern* court observed, consistent with the Supreme Court's ruling in *West v. Atkins*, 487 U.S. 42, 56 (1988), "the government's obligation to provide adequate medical care is non-delegable," *Lovern*, 2019 WL 2903589, at *3. Alleging that El Paso County contracted with Wellpath to provide medical care at the CJC is sufficient to establish that El Paso County may be held liable for Wellpath's policies and customs relating to this provision of medical care.

### iv.    *Damages*

Finally, the El Paso County Defendants object to Plaintiff's request for emotional distress damages and punitive damages, claiming they are not available under the ADA and the Rehabilitation Act and that punitive damages are not available against

municipalities. ECF No. 25 at 10. A motion to dismiss, however, is not a proper method of challenging a particular remedy. *Daniels v. Thomas*, 225 F.2d 795, 797 (10th Cir. 1955) ("It is well settled that the prayer for relief is no part of the cause of action"); *Cassidy v. Millers Cas. Ins. Co. of Texas*, 1 F. Supp.2d 1200, 1214 (D. Colo. 1998) ("[T]he test of a complaint pursuant to a motion to dismiss lies in the claim, not in the demand. Thus, the only issue on a motion [to] dismiss is whether the claim as stated would give the plaintiff a right to any relief, rather than to the particular relief demanded.").

## IV. CONCLUSION

Consistent with the above analysis, the Wellpath Defendants' Motion to Dismiss, ECF No. 48, is DENIED. The El Paso County Defendants' Motion to Dismiss, ECF No. 25, is DENIED.

DATED this 11th day of June 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge